**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**SOUTHEASTERN DIVISION**

| | | |
|---|---|---|
| **RONNIE ALLEN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:16-cv-00026-SNLJ** |
| | ) | |
| **JOHN MILLS, et al.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM AND ORDER**

This matter, a prisoner action under 42 U.S.C. § 1983, comes before the Court on

the six remaining defendants' motion for summary judgment. (#60). Their motion has

been fully briefed and is ready for disposition. For the reasons set forth below,

defendants' motion will be **GRANTED IN PART AND DENIED IN PART**.

**I. BACKGROUND**

Plaintiff Ronnie Allen, proceeding *pro se* and *in forma pauperis*, filed this prisoner

civil rights action on February 8, 2016, naming 22 defendants spanning 5 different

incidents. Pursuant to frivolity review under 28 U.S.C. § 1915(e)(2)(B), the vast majority

of defendants and claims were dismissed. All that currently remains are claims for failure

to protect, excessive force, and inhumane conditions of confinement involving three

separate incidents and the six remaining defendants seeking summary judgment. The

facts of each incident, and each defendant's individualized involvement, are set forth below.[1]

### 1. The March 20, 2015, Incident Involving Defendant Bagby

Plaintiff alleges that, on March 20, 2015, he told defendant Claude Bagby, a correctional officer, that his cellmate, Timothy Rucker, had threatened to harm him. This prompted plaintiff to seek "protective custody" from Bagby, which is a request to be moved to a different housing area called the "protective custody unit" that provides continuous monitoring of prisoners who demonstrate a sufficiently serious fear for their safety. According to plaintiff, Bagby refused to place him in protective custody and, instead, used a racial slur while stating that Rucker and plaintiff could "kill each other for all we care." When plaintiff would not move away from the cell's food port door—instead hanging his arms out to plead for Bagby to reconsider—Bagby allegedly slammed the door on plaintiff's hands and wrists. Another correctional officer then pepper sprayed plaintiff, who says he "collapsed," "passed out," and was eventually "revived" by a nurse taking his vitals inside his cell. Plaintiff alleges he was then placed on a restraint bench, where Bagby refused to allow plaintiff to wash the pepper spray off his body and face—contributing to additional injuries.

---

[1] The Court notes plaintiff did not specifically respond to defendants' statement of uncontroverted material facts as is required by Local Rule 7-4.01(E). Defendants argue their statement should, therefore, be deemed admitted. This would have the practical effect of rendering a fatal blow to plaintiff's claims. While it is true that "*pro se* litigants are not excused from compliance with relevant rules of the procedural and substantive law," *Schooley v. Kennedy*, 712 F.2d 372, 373 (8th Cir. 1983), the Court finds plaintiff did, at least, attempt to controvert defendants' statement by proffering a number of affidavits that tend to refute it. These affidavits would, of course, be the evidentiary backbone of plaintiff's denials had he submitted a traditional response to defendants' statement. In this narrow circumstance, the Court declines defendants' invitation to punitively apply Local Rule 7-4.01(E).

Bagby tells a different story. He avers that he never slammed the food port door on plaintiff's hands and wrists. He also explains that plaintiff had access to a nearby wash station while waiting on the restraint bench and, moreover, could have used the sink in the cell after being reassigned. Furthermore, Bagby says he never heard plaintiff request protective custody nor did he hear plaintiff say that he feared for his safety.

Uncontroverted medical and investigative records provide some clarification. They indicate that plaintiff was pepper sprayed by another officer at approximately 4:44 PM to compel plaintiff to back away from the food port, followed by a medical assessment at 5:05 PM that took place by nurse Cody Stanley who reported "no injuries at the time of assessment" and no symptoms of acute distress. Stanley's notes indicate plaintiff did complain of difficulty breathing (the notes reference asthma), but did not complain of burning eyes or "other injuries." The notes further indicate that plaintiff was directed to flush his eyes and mouth and that his eyes were checked for visual acuity after flushing.

### 2. The March 23, 2015, Incident Involving Defendants Brown, Schaefer, and Walls.

Following the events on March 20, 2015, plaintiff was reassigned to a new cell with cellmate Jackie Payne. According to plaintiff, on March 23, 2015, defendant Matthew Schaefer—another correctional officer—approached plaintiff's cell and told him if he wanted to eat he would have to "go to the back of the cell[,] face the bunk[,] get on [his] hands and knees[,] and put [his butt] in the air, and if [he] didn't follow [Schaefer's] directives[,] he [and his] cellmate wouldn't eat." Plaintiff admits he refused

Schaefer's directives, instead asking to speak with the sergeant on duty. Ultimately, neither plaintiff nor Payne were provided food and, as a result, Payne apparently grew angry with plaintiff and asked defendants Jerry Walls and Jeremiah Brown, fellow correctional officers working with Schaefer that day, for protective custody so that he wouldn't "punch [plaintiff] in the face." Walls allegedly responded "you can't get [protective custody] with a threat" and walked away; thereafter, Payne punched plaintiff in the face and a fight ensued, causing Brown to pepper spray both plaintiff and Payne until they ceased. Once again, plaintiff was placed on a restraint bench and, again, he was allegedly denied the ability to clean the pepper spray off his body—this time by Schaefer.

Schaefer and Walls tell a different story (Brown is apparently on leave and, therefore, was unable to provide an affidavit). According to them, Payne never threatened plaintiff and never requested protective custody. Schaefer acknowledges, however, that plaintiff failed to follow his directive in order to receive food; according to Schaefer, policy requires a prisoner to go "toward the back of the cell and away from the food port door," particularly for prisoners—like plaintiff—who had recently violated prison rules that, therefore, raise additional safety and security concerns. Schaefer does not mention whether or not he instructed plaintiff to get on his hands and knees and put his butt in the air. Schaefer does mention, however, that upon placing plaintiff on the restraint bench, nothing indicated to him that plaintiff needed a "decontamination shower" to wash off pepper spray—to the contrary, Schaefer explains that plaintiff never requested to take a shower but, had he done so, Schaefer would have sought permission from his sergeant or lieutenant.

Uncontroverted medical and investigative records, again, provide some clarification. They indicate that plaintiff was pepper sprayed by Brown at approximately 6:35 PM to stop a quarrel with Payne, followed by a medical assessment at 6:44 PM that took place by nurse Megan Aters who reported "no injuries" and provided "no treatment." Aters's notes indicate plaintiff did complain of burning eyes, but did not complain of difficulty breathing or "other injuries." The notes do not indicate whether plaintiff's eyes were flushed.

### 3. The April 7, 2015, Incident Involving Defendants Wilson and Hancock

A few weeks later, after indicating that he was suicidal, plaintiff was moved to yet another cell to be observed under so-called "suicide watch," this time with cellmate Marquise Lockhart. Both had declared they were suicidal and, though they would typically be celled individually under these circumstances, they were instead celled together because of "organized civil disobedience" within the housing unit—apparently a mass declaration of suicidal ideations by multiple prisoners at the same time—that "caused a lack of suicide cells to be available." Lockhart was involved in his own litigation surrounding the same incident and was found by this Court to have documented bipolar disorder. *See Lockhart v. Reese*, 2018 WL 690989 at *1 (E.D. Mo. Feb. 2, 2018) (Limbaugh, J.). In any event, plaintiff states Lockhart told several officers that "he would kill me then himself if [the officers] placed us in a cell together." Apparently both defendants Charles Wilson and Gregory Hancock, the correctional officers on duty that day, were told by plaintiff that Lockhart was "going to try to kill me" and, again, plaintiff requested protective custody. However, neither permitted plaintiff to be moved to a

different cell. In fact, Hancock purportedly told plaintiff that "since both of you are suicidal you should just kill each other." Later that night, plaintiff and Lockhart engaged in an altercation for "about five minutes" when another officer pepper sprayed both of them until the fighting stopped. Once more, plaintiff was placed on a restraint bench and was purportedly refused by Wilson to wash the pepper spray off. Upon returning to his cell (Lockhart was reassigned to a different cell), plaintiff allegedly told Wilson that "he needed to call haz-mat to clean the cell" because there was pepper spray, blood, and spit "all over." Wilson ignored plaintiff's request, prompting plaintiff to refuse to relinquish his handcuffs in protest, which led Wilson to push plaintiff against the door and pepper spray him so that he was incapacitated enough that the handcuffs could be removed. Later, plaintiff states he was in so much pain from the pepper spray that he attempted to hang himself with the strings of his boxers but was unsuccessful after Wilson saw him and, again, placed him on the restraint bench until the next shift arrived.

Wilson and Hancock tell a different story. Neither recall plaintiff asking for protective custody, and both indicate there were no signs that plaintiff and Lockhart were enemies or otherwise a threat to each other. Both were being monitored several times an hour. Hancock does not recall saying that plaintiff and Hancock should have harmed each other. However, Wilson admits he sprayed plaintiff with pepper spray after trying to place plaintiff back into his cell following the altercation with Lockhart; Wilson states that plaintiff resisted his attempts to remove plaintiff's wrist restraints, which necessitated a short burst of spray in order to briefly disable plaintiff long enough to remove the restraints.

Again, uncontroverted medical and investigative records are informative. They indicate that plaintiff was pepper sprayed by another officer at approximately 9:35 PM to stop a quarrel with Lockhart, followed by a medical assessment at 9:52 PM that took place by nurse Lisa Taber who reported "no injuries" and provided "no treatment." Taber's notes indicate plaintiff did complain of "other injuries" (rib and wrist pain), but did not complain of burning eyes or difficulty breathing. The notes indicate the presence of acute distress, and encouraged plaintiff to flush his eyes. Allegedly, plaintiff was seen by a nurse three days later, on April 10, 2015, who noted no signs of trauma, no existing medical complaints, and indicated that plaintiff denied any medical problems.[2]

## II. LEGAL STANDARDS FOR SUMMARY JUDGMENT

Courts repeatedly recognize that summary judgment is a harsh remedy that should be granted only when the moving party has established his or her right to judgment with such clarity as not to give rise to controversy. *New England Mut. Life Ins. Co. v. Null*, 554 F.2d 896, 901 (8th Cir. 1977). Summary judgment motions, however, "can be a tool of great utility in removing factually insubstantial cases from crowded dockets, freeing courts' trial time for those that really do raise genuine issues of material fact." *Mt. Pleasant v. Associated Elec. Coop. Inc.,* 838 F.2d 268, 273 (8th Cir. 1988).

---

[2] For this particular nurse visit, defendants cite "Defendants' Exhibit H" at bates number 0481. This particular record does not appear to be in Exhibit H, which begins at bates number 0517. In any event—as explained in footnote 1 above—plaintiff did not specifically respond to defendants' statement of uncontroverted material facts as is required by Local Rule 7-4.01(E). Because plaintiff's proffered affidavits do not controvert this particular factual allegation, it will be deemed admitted under Rule 7-4.01(E). *See McDonald*, 2013 WL 121430 at *2 (E.D. Mo. Jan. 9, 2013) (applying Local Rule 7-4.01(E) and deeming defendants' statement as fully admitted only after finding *pro se* plaintiff's pleadings and affidavit—even when construed broadly—did not actually rebut the assertions made in defendants' statement).

Pursuant to Federal Rule of Civil Procedure 56(c), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." *Poller v. Columbia Broadcasting Sys., Inc*., 368 U.S. 464, 467 (1962). The burden is on the moving party. *Mt. Pleasant*, 838 F.2d at 273. After the moving party discharges this burden, the non-moving party must do more than show there is some doubt as to the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 (1986). Instead, the non-moving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

In ruling on a motion for summary judgment, the court must review the facts in a light most favorable to the party opposing the motion and give that party the benefit of any inferences that logically can be drawn from those facts. *Buller v. Buechler*, 706 F.2d 844, 846 (8th Cir. 1983). The court is required to resolve all conflicts of evidence in favor of the non-moving party. *Robert Johnson Grain Co. v. Chem. Interchange Co.,* 541 F.2d 207, 210 (8th Cir. 1976).

## III. ANALYSIS

Defendants move for summary judgment on plaintiff's Eighth Amendment claims under Section 1983 in their individual capacities. Defendants maintain there is no genuine issue of material fact and that plaintiff cannot demonstrate any violation of his Eight Amendment rights. They also argue that they are entitled to qualified immunity

because no constitutional rights were violated. The Court notes that three unique claims are being made against these various defendants: excessive force; inhumane conditions of confinement; and failure to protect. All three implicate the Eighth Amendment, though the particular standards vary somewhat. These standards are set forth below.

When a prison official is responding to a disturbance and is charged with the use of excessive force, a deferential "malicious and sadistic" standard applies under the Eighth Amendment. *Taylor v. Dormire*, 690 F.3d 898, 903 (8th Cir. 2012); *see also Jackson v. Gutzmer*, 866 F.3d 969, 976 n. 3 (8th Cir. 2017) (explaining the subtle differences in a conditions-of-confinement case versus an excessive force case as relates to the use of passive restraints). Under this standard, the court "inquire[s] whether the force was applied in a good-faith effort to maintain or restore discipline, or used maliciously and sadistically for the purpose of causing harm." *Taylor*, 690 F.3d at 903. A prison official exhibits sadism by "delighting in cruelty," by inflicting pain "for one's own pleasure," or by engaging in conduct "so brutal, demeaning, and harmful as to literally shock the conscience." *Parkus v. Delo*, 135 F.3d 1232, 1234 (8th Cir. 1998); *Davis v. Forrest*, 768 F.2d 257, 258 (8th Cir. 1985). While the extent of injury is material to the question of damages, the "core judicial inquiry" is narrowly focused on whether force was applied in good faith or in an effort to cause harm. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). However, "not every malevolent touch by a prisoner guard gives rise to a federal cause of action" and, therefore, where there is a lack of discernable injury, this may be enough to show "a *de minimis* application of force [that] will not give result in a constitutional violation." *Williams v. Jackson*, 600 F.3d 1007, 1012 (8th Cir. 2010)

(*quoting Hudson v. McMillian*, 503 U.S. 1, 9 (1992)); *see also Wilkins*, 559 U.S. at 38 ("An inmate who complains of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim."). Ultimately, the "malicious and sadistic" standard is a high bar that provides necessary deference to prison officials responding to a disturbance. *See Taylor*, 690 F.3d at 903; *Davis*, 768 F.2d at 258.

When there are no exigent circumstances involving threats to safety and security that necessitate the use of force, but instead the claim revolves around prison conditions generally such as the adequacy of food, clothing, shelter, and access to medical care, a less-deferential "deliberate indifference" standard applies under the Eighth Amendment. *Taylor*, 690 F.3d at 903 (noting that "the subjective requirement of the Eighth Amendment inquiry becomes less exacting" in a condition-of-confinement case). Under this standard, "the plaintiff must allege prison officials acted with deliberate indifference to the inmate's health or safety." *Id*. This is shown when the official subjectively "knows of and disregards an excessive risk to [the] inmate['s] health or safety" and where the complained-of-conditions were objectively serious or else caused objectively serious injury. *Id*. (*quoting Farmer v. Brennan*, 511 U.S. 825, 837 (1994)); *Berryhill v. Schriro*, 137 F.3d 1073, 1076 (8th Cir. 1998). Thus, most critically, a showing of *actual knowledge* of an excessive risk of harm is required and, without it, the "prison official who lacked knowledge of a risk cannot be said to have inflicted punishment." *Taylor*, 690 F.3d at 903; *see also Kulkay v. Roy*, 847 F.3d 637, 643 (8th Cir. 2017) (noting "mere negligence or inadvertence does not rise to the level of deliberate indifference" and,

instead, "deliberate indifference requires a highly culpable state of mind approaching actual intent").

Finally, a failure-to-protect claim is a derivative of the more generalized prison-conditions claim. It, too, adopts the deliberate indifference standard under the Eighth Amendment. Thus, like the typical prison-conditions case, "[a] failure-to-protect claim has an objective component, whether there was a substantial risk of harm to the inmate, and a subjective component, whether the prison official was deliberately indifferent to that risk." *Jones*, 641 Fed.Appx. at 666 (*quoting Curry v. Crist*, 226 F.3d 974, 977 (8th Cir. 2000)). The objective prong is satisfied where an assailant's conduct demonstrates a concrete potential for violence and aggression towards the plaintiff. *See Nelson v. Shuffman*, 603 F.3d 439, 447 (8th Cir. 2010) (assailant's history of sexual assault, violent behavior, and relentless barrage of physical and sexual threats made it "readily apparent" that plaintiff faced an objectively serious risk of harm by being placed in the same room as assailant). However, the mere possibility of violent and aggressive tendencies based on generic observations of a prisoner's past has generally been held insufficient standing alone. *See Blades v. Schuetzle*, 302 F.3d 801, 803-804 (8th Cir. 2002) (noting that prisons "are not required to segregate indefinitely all inmates whose original crimes suggest they might be capable of further violence" and concluding prison officials had "good objective reason" to believe assailant, serving a life sentence that suggests generally an effort to "avoid trouble," was sufficiently incentivized to behave).

The subjective prong of a failure-to-protect claim is demonstrated by showing the prison official "actually knows of the substantial risk and fails to respond reasonably to

it." *Young v. Selk*, 508 F.3d 868, 873 (8th Cir. 2007). Thus, the focus is on whether there was an actual awareness of a concrete risk and a deliberate failure to respond to it. *Id*. However, given how common threats and puffery are between prisoners, it is generally insufficient to base a claim on a threat without some other corroborative conduct indicating concreteness to that threat. *See Pagels v. Morrison*, 335 F.3d 736, 740-741 (8th Cir. 2003). Critically, because a failure-to-protect claim ultimately lies in tort, a plaintiff must suffer some actual injury that is greater than a *de minimis* injury. *Irving v. Dormire*, 519 F.3d 441, 448 (8th Cir. 2008). And of course, under the subjective prong, prison officials must actually be aware of an assailant's proclivity for violence and aggression. *See Patterson v. Kelley*, 902 F.3d 845, 852 (8th Cir. 2018).

**1. Claims for Failure to Protect, Excessive Force, and Inhumane Conditions of Confinement Against Bagby Related to the March 20, 2015, Incident**

Summary judgment will be granted on plaintiff's failure-to-protect claim against Bagby. The record does not reveal that Rucker ever actually injured or even attempted to injure plaintiff. Rather, all the record demonstrates—when viewed in a light most favorable to plaintiff as the non-movant—is that plaintiff feared for his life, sought protective custody, was denied, and later was sprayed with pepper spray in protest of this denial. While the use of pepper spray without cause might cross the *de minimis* injury threshold, *see Foulk v. Charrier*, 262 F.3d 687, 692 (8th Cir. 2001), the pepper spray used against plaintiff on March 20, 2015, had nothing to do with Rucker's threats—there is no causal relation between the pepper spray and plaintiff's failure-to-protect claim. Because plaintiff cannot point to how he was injured as a consequence of Bagby's denial

of plaintiff's request for protective custody, plaintiff's failure-to-protect claim fails as a matter of law.

Summary judgment will also be granted on Plaintiff's excessive force claim against Bagby. Again, though the parties disagree on whether or not Bagby "slammed" the food port door on plaintiff's hands and wrists, it is clear that whatever physical interaction may have resulted between plaintiff and prison officials was as a result of Bagby's self-created disturbance in refusing to back away from the food port. Plaintiff may prefer the verb "slam" to something less inflammatory, but, regardless of the word used, what is clear from the medical evidence is that no meaningful injury resulted. Indeed, upon seeing the nurse mere minutes later, plaintiff made no mention of his hands and wrists—nor did the nurse appear to find them a concern—and plaintiff mentioned nothing more than a difficulty breathing. Of course, the focus in an excessive force claim is squarely on the nature of the force used and not the extent of an injury, *see Wilkins*, 559 U.S. at 34. But, even so, the lack of discernable injury coupled to circumstances that permitted the use of reasonable force by Bagby and his fellow officers to compel plaintiff's compliance indicates a lack of both maliciousness and sadism. Simply put, there is no suggestion in the evidence, even if viewed in a light most favorable to plaintiff, that Bagby's actions were for the mere purpose of causing injury or that Bagby's actions rose to the level of excessive cruelty. The use of an inflammatory verb, whatever strategic effect may be gained from it, cannot overcome these high bars. Moreover, because plaintiff appears unable to show the existence of any *actual injury*

resulting from Bagby's alleged actions—a distinction from *Wilkins*'s admonishment not to focus on the particualr *extent of injury*—summary judgment is appropriately granted.

Summary judgment will also be awarded to Bagby on plaintiff's inhumane conditions of confinement claim. The Eighth Circuit has clarified that the failure to permit a prisoner to wash off pepper spray invokes the "deliberate indifference" standard and not the "malicious and sadistic" because a "delayed decontamination claim … is not an excessive force claim." *Burns v. Eaton*, 752 F.3d 1136, 1140 (8th Cir. 2014). In essence, the use of pepper spray must be distinguished from a later refusal to allow it to be washed off. Thus, under the deliberate indifference standard, plaintiff is required to demonstrate an objectively "serious medical need" resulting from the inability to wash off the pepper spray. *Id*.

Here, plaintiff has not demonstrated an objectively serious medical need for which to base his delayed decontamination claim against Bagby. Even if Bagby did, in fact, refuse plaintiff's request to decontaminate while sitting on the restraint bench, the evidence demonstrates that plaintiff was seen by a nurse roughly twenty minutes after being sprayed who reported no acute distress, no burning eyes, and no skin-related conditions such as a rash. The nurse's notes appear to indicate plaintiff's eyes and mouth—if not his entire body—were flushed with water. And while Plaintiff did complain of a difficulty breathing (apparently from asthma), there is no indication whatsoever that a full-body shower would have remedied that complaint—nor does difficulty breathing appear to be the focus of plaintiff's complaint or his affidavit. It is also noteworthy that plaintiff does not deny he had access to running water upon being

returned to his cell. All in all, plaintiff has not identified an objectively serious medical need that resulted from Bagby's alleged refusal to permit plaintiff to shower; plaintiff fails to point to any medical record, for example, that demonstrates harm was caused specifically as a result of Bagby's refusal.

In addition to the lack of an objectively serious medical need, plaintiff failed to demonstrate that Bagby had actual knowledge of any such need by plaintiff's mere request for a shower—there is no evidence that, in requesting a shower, plaintiff made known to Bagby any particular serious medical need outside of general discomfort.

### 2. Claim for Failure to Protect Against Brown Related to the March 23, 2015, Incident

Summary judgment will not be granted on plaintiff's failure-to-protect claim against Brown. Objectively speaking, plaintiff sufficiently demonstrates that he suffered a serious injury. "Assault at the hands of fellow inmates … is a serious harm." *Jensen v. Clarke*, 94 F.3d 1191, 1198 (8th Cir. 1996). And, somewhat uniquely here, plaintiff's assaulter—Payne—admits by way of affidavit that he did, in fact, assault plaintiff by punching him in the face. The objective element has been met. That leaves the subjective element: did Brown know he was creating a substantial risk of bodily harm by summarily denying protective custody? Notably, this is not the sort of case where protective custody was sought over a diffuse, generalized fear that militates against the existence of subjective awareness—this was not a case of a prison official being forced to guess or postulate as to what, specifically, a prisoner may have feared. In this case, construing the facts in a light most favorable to plaintiff, Payne specifically announced he was going to

assault his cellmate, and Brown called Payne's bluff by taking no action—presumptively because he believed Payne's statements to be mere bluster. In this scenario, a factual dispute exists that does not permit summary judgment. Unanswered questions remain, for example, about the obviousness of the risk and what information Brown possessed about Payne at the time (i.e. reasons why he did or did not believe Payne); and nothing has been said about the practical limitations, if any, Brown confronted in choosing a course of action. Instead, Brown supplies an affidavit that, in essence, says plaintiff's story is false, that simply does not suffice for purposes of summary judgment.

### 3. Claim for Failure to Protect Against Walls Related to the March 23, 2015, Incident

For the same reasons expressed above in relation to plaintiff's failure-to-protect claim against Brown, summary judgment will not be granted to Walls. In fact, construing the facts in a light most favorable to plaintiff once more, Walls took the additional step of telling Payne "you can't get [protective custody] with a threat." That, again, seems to be an attempt to call Payne's bluff; Walls was aware of the threat, but did not treat it as a credible one—factual issues remain as to whether that response was appropriate. Moreover, Walls's comment is simply erroneous: it is the threat itself which precipitates the need for protection. *Farmer*, 511 U.S. at 845 (noting a prisoner need not "await a tragic event such as an actual assault before [seeking] relief"). Of course protective custody can (and should) be given when there is a legitimate threat of violence; the question, then, is whether, subjectively speaking, Walls knew of an actual risk and simply did not care enough to respond to it, or whether Walls did not fully appreciate the reality

of that risk based on his unique understanding of the situation. Ultimately, questions of fact remain as to, for example, the obviousness of the risk, information known by Walls about Payne, Walls's past experiences with both Payne and plaintiff, and any limitations he may have faced in making a decision to refuse protective custody.

### 4. Claims for Failure to Protect and Inhumane Conditions of Confinement Against Schaefer Related to March 23, 2015, Incident

Summary judgment will be granted on plaintiff's failure-to-protect claim against Schaefer. Both plaintiff and Payne state in their affidavit that protective custody was sought only from Brown and Walls. There is no indication in either affidavit that Schaefer was personally asked by either prisoner for protective custody related to potential violence between them. Rather, Payne—for example—states that Schaefer "left the cell" before Payne grew angry from not being fed, which prompted his request for protective custody so that he would not be tempted to punch plaintiff in the face. Because Schaefer was not involved in the failure-to-protect aspect of plaintiff's claim, summary judgment will be granted to Schaefer on that claim.

Summary judgment will also be granted to Schaefer on plaintiff's inhumane conditions of confinement claim. As was identified in Bagby's analysis above, plaintiff must demonstrate an objectively "serious medical need" resulting from the inability to wash off pepper spray. But, again, even if Schaefer refused plaintiff's request to decontaminate while sitting on the restraint bench, the evidence demonstrates that plaintiff was seen by a nurse roughly ten minutes after being sprayed who reported no injuries other than burning eyes. Medical notes are unclear whether plaintiff's eyes were

flushed on this occasion, but there is no indication that complications resulted from Schaefer's refusal or that Schaefer refused whatever recommendation was made by the nurse. Moreover, plaintiff had access to running water upon returning to his cell and the records do, at least, indicate plaintiff was assessed for any subjective complaints of pain while sitting on the restraint bench that, in the nurse's judgment, required no treatment. Most importantly, though, and in the addition to the lack of clear, objectively serious medical needs that went unaddressed, plaintiff fails to demonstrate Schaefer had any actual knowledge of an unaddressed medical need; while plaintiff requested to decontaminate citing general discomfort, Schaefer was not made aware of specific, serious medical needs that required immediate attention.

### 5. Claims for Failure to Protect, Excessive Force, and Inhumane Conditions of Confinement Against Wilson Related to the April 7, 2015, Incident

Summary judgment will not be granted on plaintiff's failure-to-protect claim against Wilson. This claim is quite similar to plaintiff's failure-to-protect claim against Brown and Walls. Plaintiff was assaulted by a fellow inmate, satisfying the objective component. And Lockhart appears, perhaps, to be more of an aggressor than was Payne. Lockhart has a documented history of bipolar disorder. Unlike Payne, who threated to punch plaintiff, Lockhart threatened to outright kill plaintiff. Notably, both were on suicide watch at the time, which itself raises some concern that they were celled together. And, of course, there was a recent prior altercation—the March 23rd incident with Payne—that could reasonably suggest that plaintiff was at heightened risk for ending up in fights with other inmates. Again, this is not a case of diffuse, generalized fear; rather,

Wilson was put on notice of Lockhart's intention to harm plaintiff and he simply chose not to act upon it. Ultimately, questions of fact once again remain as to the obviousness of the risk, the information known by Wilson about Lockhart, Wilson's past experiences with both Lockhart and plaintiff, and any limitations he may have faced in making a decision to refuse protective custody.

However, summary judgment will be granted on plaintiff's excessive force claim against Wilson. This claim is based on Wilson's use of pepper spray when trying to return plaintiff to his cell following the fight with Lockhart. Plaintiff acknowledges he refused Wilson's directives and does not refute Wilson's claims that he provided several directives to comply, which were ignored, that led to a "short burst of pepper spray" causing plaintiff to release his hold on the food port. Again, there is no showing that Wilson lacked just cause to use the pepper spray or intended to harm plaintiff for his own pleasure; nor do these facts suggest Wilson engaged in extreme or excessive cruelty. Moreover, there appears to be no discernable injury. Plaintiff argues the pain was so bad that he tried to hang himself with his underwear strings; but, that appears to have more to do with plaintiff's suicidal mindset at the time than it does actual pain related to being pepper sprayed. In the prior situations involving pepper spray, for example, plaintiff never referenced such an extreme level of pain—nor does plaintiff explain why, this time, it was that much worse.

Summary judgment will also be granted to Wilson on plaintiff's inhumane conditions of confinement claim. As was identified in Bagby and Schaefer's analysis above, plaintiff must demonstrate an objectively "serious medical need" resulting from

the inability to wash off pepper spray. But, again, even if Wilson refused plaintiff's request to decontaminate while sitting on the restraint bench, the evidence demonstrates that plaintiff was seen by a nurse roughly seventeen minutes after being sprayed who reported acute distress related to rib and wrist pain, but nothing at all related to burning eyes or difficulty breathing. It is difficult to surmise how Wilson's failure to permit plaintiff to wash off pepper spray would alleviate plaintiff's rib and wrist pain. Once again, there is no indication that complications resulted from Wilson's refusal or that Wilson refused whatever recommendation was made by the nurse. Moreover, the records indicate plaintiff was assessed three days later where it was noted that plaintiff had no signs of trauma and no existing medical complaints.

Most importantly, though, and in addition to the lack of clear objectively serious medical needs that went unaddressed, plaintiff fails to demonstrate Wilson had any actual knowledge of an unaddressed medical need. While plaintiff requested to decontaminate citing general discomfort, Wilson was not made aware of specific, serious medical needs that required immediate medical attention. Finally, to the extent plaintiff's claim instead targets the allegedly dirty cell that he returned to—the complaint is somewhat unclear— plaintiff yet again identifies no serious medical need that arose from this situation and fails to identify how long his cell was in such a condition. A claim of general dirtiness, alone, is insufficient—indeed, the Eighth Circuit has held that conditions far worse than those alleged by plaintiff failed to rise to the level of a constitutional violation. *See Goldman v. Forbus*, 17 Fed.Appx. 487, 488 (8th Cir. 2001) (six nights sleeping on a floor while being sprinkled with urine was not a constitutional violation); *Smith v. Copeland*,

87 F.3d 265, 269 (8th Cir. 1996) (no constitutional violation when pretrial detainee was subject to raw sewage from overflowing toilet for four days).

### 6. Claim for Failure to Protect Against Hancock Related to the April 7, 2015, Incident

Summary judgment will not be granted on plaintiff's failure-to-protect claim against Hancock for the same reasons it was not granted to Wilson. The analysis is identical, with the added caveat that Hancock apparently even encouraged Lockhart and plaintiff to kill each other—a fact that, if true, would tend to demonstrate deliberate disregard for either person's safety. Hancock's affidavit, which does little more than refute plaintiff's story, creates, at best, a genuine factual dispute for the jury. And, ultimately, questions of fact once again remain as to the obviousness of the risk, the information known by Hancock about Lockhart, Hancock's past experiences with both Lockhart and plaintiff, and any limitations he may have faced in making a decision to refuse protective custody.

## IV. CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that defendants' motion for summary judgment is **GRANTED** on plaintiff's failure-to-protect, excessive force, and inhumane conditions of confinement claims against defendant Bagby.

**IT IS FURTHER ORDERED** that defendant's motion for summary judgment is **DENIED** on plaintiff's failure-to-protect claim against defendant Brown.

**IT IS FURTHERED ORDERED** that defendant's motion for summary judgment is **DENIED** on plaintiff's failure-to-protect claim against defendant Walls.

**IT IS FURTHERED ORDERED** that defendant's motion for summary judgment is **GRANTED** on plaintiff's failure-to-protect and inhumane conditions of confinement claims against defendant Schaefer.

**IT IS FURTHERED ORDERED** that defendant's motion for summary judgment is **DENIED IN PART AND GRANTED IN PART** on plaintiff's claims against defendant Wilson.

Summary judgment is **GRANTED** on plaintiff's claims for excessive force and inhumane conditions of confinement against Wilson.

Summary judgment is **DENIED** on plaintiff's failure-to-protect claim against Wilson.

**IT IS FURTHER ORDERED** that defendant's motion for summary judgment is **DENIED** on plaintiff's failure-to-protect claim against defendant Hancock.

So ordered this <u>26th</u> day of November 2018.

_____

STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE